885 A.2d 403

**Bonnie CRUICKSHANK–WALLACE**

v.

**COUNTY BANKING AND TRUST COMPANY.**

**No. 1447, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 31, 2005.

301

Melvin J. Sykes, Baltimore, for appellant.

Lawrence J. Gebhardt (Dale S. Betterton, Gebhardt & Smith, LLP, on brief), Baltimore, for appellee.

Panel KENNEY, EYLER, DEBORAH S. and ADKINS, JJ.

Opinion by EYLER, DEBORAH S., J.

In the Circuit Court for Cecil County, County Banking and Trust Company ("the Bank"), the appellee, sued Bonnie

Cruickshank Wallace ("Bonnie"), the appellant, for actual and constructive fraudulent conveyances under the Maryland Uniform Fraudulent Conveyance Act ("MUFCA"), Md.Code (1975, 2000 Repl.Vol.), sections 15–201 through 15–214 of the Commercial Law Article ("CL").

In a prior suit ("the Debt Action"), the Bank had obtained a judgment against Great Christian Books, Inc. ("GCB"), and William Wallace ("William"), Bonnie's husband, as guarantor of a debt of GCB. It is undisputed that the judgment in the Debt Action rendered William insolvent. In the case at bar, the Bank alleged that, in 1999, after he was insolvent, William fraudulently conveyed his 1998 federal and state income tax refunds to Bonnie, thus keeping them out of the Bank's reach.

Bonnie and the Bank each moved for summary judgment. The court denied Bonnie's motion and granted the Bank's motion.[1]

Bonnie noted an appeal, posing two questions, which we have rephrased slightly:

I.  Did the circuit court err in denying her motion for summary judgment on the fraudulent conveyance claim for the amount of the 1998 federal and state income tax refunds?

II. Did the circuit court err in granting summary judgment to the Bank on its fraudulent conveyance claim for the amount of the 1998 federal and state income tax refunds?

For the reasons set forth below, we answer "no" to both questions and shall affirm the judgment of the circuit court.

---

1. The Bank's complaint included other allegedly fraudulent conveyances, in addition to the transfer of the income tax refunds. The court granted summary judgment in favor of Bonnie on some of those other fraudulent conveyance claims. They are not the subject of this appeal. The court denied summary judgment on yet other of those fraudulent conveyance claims. The Bank thereafter voluntarily dismissed those claims.

## FACTS AND PROCEEDINGS

At all times pertinent to this case, William and Bonnie were husband and wife and were living together in an intact marriage with their two sons, born in 1990 and 1993. William has an adult child from a prior marriage who visits the Wallaces occasionally, but does not live with them.

The Wallaces were married in 1987. On November 27, 1987, they executed a property agreement.[2] They amended that agreement on December 4, 1991, while residing in the State of Washington, which is a community property state, by means of a document entitled "Separate Property Status Agreement."[3] It appears from the name of the December 4, 1991 agreement that it and the prior agreement were entered into for the purpose of characterizing some of the Wallaces' property—that otherwise would be community property under the laws of the State of Washington—as their own separate property.

On June 8, 1994, William purchased 75% of the stock of GCB from Walter C. Hibbard and Phillip Hibbard.

A week later, the Wallaces executed a "Community Property Agreement,"[4] modifying their December 4, 1991 Separate Property Status Agreement. The modification language states:

> [Bonnie] and [William] agree as follows.... [Bonnie] and [William] shall own as community property the assets pertaining to the June 8, 1994 Agreement Stock Ownership Of Great Christian Books, Inc. entered into between Walter C. Hibbard, Phillip Hibbard, and [William] including, without limitation: 203 shares of Great Christian Books, Inc.

---

2. That agreement is not in the record.

3. That document also is not a part of the record.

4. The Community Property Agreement does not bear a signed date but states in the body of the agreement that it is "dated effective June 15, 1994."

("GCB") stock transferred from Walter C. Hibbard; and 547 shares of authorized GCB stock to be immediately issued; and all future issued and transferred GCB Stock and any stock of any present and future affiliate of GCB to either [Bonnie] or [William] or any entity owned in part or whole by either or both of the parties hereto.

Sometime in late 1994 or early 1995, the Wallaces moved from Washington to Pennsylvania, which is not a community property state. In May of 1995, the Bank extended a one-year revolving line of credit and a $234,000 secured loan to GCB. William gave a personal guaranty of payment for GCB on both obligations.

On June 1, 1995, the Wallaces executed a document entitled "Transfer Agreement,"[5] which modified their June 15, 1994 Community Property Agreement. The Transfer Agreement states:

> [Bonnie] and [William] agree as follows.... [William] transferred his interest in the stock of Great Christian Books, Inc. ("GCB") to the community property of [Bonnie] and [William], as provided in the June 15, 1994 Community Property Agreement, *and [William] hereby transfers all his rights and property ("benefits") from his late father's estate, and from GCB to and to be derived by [William], including without limitation, deposits in GCB's employee deposit plan, loan repayment obligations, pension and retirement plans, wages, reimbursements, refunds, options, commissions, bonuses, deferred compensation, automobile and equipment leases, and from legal claims that [William] may have concerning GCB, to [Bonnie] and [William] to be held in common during the term of their marriage with the survivor owning these benefits in entirety.*

(Emphasis added.)

At the end of 1996, the GCB credit line was paid off, and then was renewed for $750,000. It was again renewed in early 1998. The loans were current until October of 1998.

---

**5.** The "Transfer Agreement" is not dated either, but states in its body that it is "dated effective June 1, 1995."

That month, GCB missed a payment. The Bank accelerated the loan balance and, in the Circuit Court for Cecil County, filed a confessed judgment action against William, as guarantor. On November 25, 1998, a confessed judgment was entered in favor of the Bank and against William.[6]

In 1998, GCB was paying William a salary, from which federal and state income taxes were withheld. Immediately after the judgment was entered against him in the Debt Action, William stopped taking a salary from GCB and started collecting $1,000 a month in unemployment benefits.

Somewhere in this time frame, not clearly disclosed by the record, the Wallaces moved to Elkton, Maryland.

In early 1999, William and Bonnie filed joint federal and state income tax returns for the 1998 tax year. The returns, prepared by an accountant, showed they were entitled to a $19,984 tax refund from the Internal Revenue Service ("IRS") and a $2,821 tax refund from the State Comptroller's Office. The refund amounts equaled the amounts of federal and state income tax withheld from William's 1998 salary from GCB. Bonnie did not earn any income in 1998. She did have a loss carry-forward, however, from her subchapter S corporation, Cruickshank Holsteiners, Inc., a horse boarding and breeding business.

In April and May of 1999, the Wallaces received income tax refund checks from the IRS and the Maryland Comptroller's Office. The checks were payable to both of them. William endorsed the checks and gave them to Bonnie, who deposited them in her Merrill Lynch CMA account ("CMA account"). Bonnie's CMA account statements show that the amount of the state refund check, $2,821, was added to her account balance on April 19, 1999, and the amount of the federal refund, $19,984, was added to her account balance on May 3, 1999. Statements for the CMA account show in detail how the

---

6. The amount of the judgment is unclear. Bonnie states that it was $722,534, while the Bank maintains that it was $865,959.34. In either case, the debt rendered William insolvent.

funds were spent.[7] Bonnie spent the entire $22,805 in income tax refunds by June 30, 1999.

The Bank learned of these and other transfers through discovery in aid of enforcement, including a deposition of William taken on May 21, 1999, and a deposition of Bonnie taken on March 31, 2000.

On February 24, 2000, in the Circuit Court for Cecil County, the Bank filed the instant suit against Bonnie.[8] The Bank alleged that William's transfer to Bonnie of the refund from his 1998 federal income tax return was a fraudulent conveyance. Specifically, it alleged that the transfer was an actual fraudulent conveyance, because it was made with the actual intent to defraud William's creditors, see CL § 15–207; and that the transfer was a constructive fraudulent conveyance, because, even if made without an actual intent to defraud, it was made when William was insolvent and was not for fair consideration. See CL § 15–204. The Bank asked the court to set aside the conveyance or, in the event that Bonnie had made a subsequent transfer of the money, enter a judgment against her in the amount of the transfer.

Bonnie did not file a timely answer. Ultimately, on September 11, 2001, the court entered a default judgment against her for $19,984, the amount of the 1998 federal income tax refund.[9] Bonnie pursued an appeal to this Court. In a reported opinion, filed on September 26, 2002, we vacated the default judgment. See *Holly Hall Publ'ns, Inc. v. County Banking and Trust Co.*, 147 Md.App. 251, 807 A.2d 1201 (2002).[10]

---

7. We discuss these account statements, as well as other evidence in the record as to how these funds were spent, in Part II of our discussion.

8. Other defendants were named as well; the claims against them all were dismissed or resolved.

9. There were other default judgments entered against Bonnie, but they are not pertinent to this appeal.

10. In the meantime, between the entry of default judgment and the decision by this Court, the Bank instituted enforcement proceedings against Bonnie by requesting writs of garnishment (for assets held by

Upon remand to the circuit court, the parties engaged in discovery, the Bank amended its complaint to add actual and constructive fraudulent conveyance of the 1998 Maryland state income tax refund, and each filed a plethora of motions and cross-motions. After still more discovery was undertaken, the operative motions left pending were those by each party for summary judgment.

Bonnie's theory on summary judgment was that, on the undisputed facts, the income tax refunds were from their inception tenancy by the entirety property not reachable by William's creditors. For that reason, there was no conveyance of the property from William to her, let alone a fraudulent conveyance. She put forth four reasons as to why the refunds were tenancy by the entirety property. First, the Transfer Agreement made all benefits to William generated by GCB, including wages and future income tax refunds, tenancy by the entirety property. Second, the refunds were tenancy by the entirety property because they were paid by checks issued to William and Bonnie as joint payees. Third, the Wallaces' filing status of "married filing jointly" made the refunds tenancy by the entirety property. Finally, the tax refunds were tenancy by the entirety property because they resulted at least in part from an operating loss carry-forward on Bonnie's subchapter S corporation.

The Bank responded that the income tax refunds were William's individual property, not tenancy by the entirety property. It argued that the Transfer Agreement could not, without further action, convert future income tax refunds into tenancy by the entirety property; that, under controlling caselaw, when withholding can be ascribed to an individual's

several banks and by Cruickshank Holsteiners, Inc.) and writs of execution (for personal property located in Bonnie's home and located at Cruickshank Holsteiners, Inc.). The Bank was in the process of acquiring judgments of absolute condemnation on some of the assets held by the garnishees when all of the execution efforts were stayed pursuant to Bonnie's filing Chapter 11 bankruptcy in the United States District Court for the Eastern District of Pennsylvania on November 13, 2001. Bonnie's bankruptcy case ultimately was "dismissed" by that court as of February 22, 2002.

income, an income tax withholding refund is the individual property of that income earner, regardless of joint filing status or that the joint filers both are payees on the refund check; and that Bonnie's loss carry-forward did not make the refunds tenancy by the entirety property.

The Bank sought summary judgment on its claim for constructive fraudulent conveyance only. It argued that, on the undisputed material facts, the income tax refunds were transferred by William to Bonnie when William was insolvent and not for fair consideration.

Bonnie responded that, even if the refunds were not tenancy by the entirety property, and were solely William's property, he received fair consideration for the transfer of the refunds to her, because she used the refund money for "family necessaries," that is, necessary support for William and their two children.

The Bank replied by stating that Bonnie could not show fair consideration by demonstrating that she spent the funds on "family necessaries," because the doctrine of necessaries has been abolished in Maryland and, in any event, Bonnie did not make a showing on the summary judgment record that she spent the funds on "family necessaries." Additionally, because Bonnie knew about William's "unfavorable financial situation," even if the transfers were supported by adequate consideration, she could not show that she acted in good faith, which is an element of fair consideration.

The court held a hearing on all open motions on April 16, 2004. It took the matter under advisement and, on May 24, 2004, issued a memorandum opinion and order, entered the same day. It denied Bonnie's motion for summary judgment and granted summary judgment in favor of the Bank for $22,805.

The court concluded that the income tax refunds were not tenancy by the entirety property; that it was undisputed that William transferred the refunds to Bonnie when he was insolvent; that there was no evidence on the summary judgment record that could support a finding that the transfers were for

fair consideration; and, to the contrary, the evidence on the summary judgment record showed that William received "no consideration" for the transfers. Accordingly, the court found that the transfer of the tax refunds constituted a constructive fraudulent conveyance as a matter of law.

Bonnie noted a timely appeal.

We shall include additional facts as necessary to our discussion of the issues.

## STANDARD OF REVIEW

We review a circuit court's decision to grant summary judgment *de novo*, as it is a purely legal decision. *O'Connor v. Baltimore County*, 382 Md. 102, 110, 854 A.2d 1191 (2004); *Hines v. French*, 157 Md.App. 536, 549–50, 852 A.2d 1047 (2004). We determine whether the circuit court properly concluded that there was no dispute of material fact, and, if so, whether the circuit court's decision that the moving party was entitled to summary judgment was legally correct. Md. Rule 2–501(f); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98 (2004); *Smith v. City of Baltimore*, 156 Md.App. 377, 382–83, 846 A.2d 1121 (2004).

A material fact is a fact that would alter the outcome of a case depending upon how the fact-finder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 489, 665 A.2d 297 (1995). The nonmoving party must demonstrate a dispute of material fact by proffering facts that would be admissible into evidence. *O'Connor, supra*, 382 Md. at 111, 854 A.2d 1191; *Beyer v. Morgan State Univ.*, 139 Md.App. 609, 634, 779 A.2d 388 (2001), *aff'd*, 369 Md. 335, 800 A.2d 707 (2002). Moreover, "[b]ald, unsupported statements or conclusions of law" do not generate a genuine dispute of material fact, and thus cannot defeat a motion for summary judgment. *Hoffman Chevrolet, Inc. v. Wash. County Nat'l Sav. Bank*, 297 Md. 691, 712, 467 A.2d 758 (1983).

Finally, " 'even in cases involving intent and motive, if the prerequisites for summary judgment are met—there being no

dispute of material fact—summary judgment may be granted.'" *Rite Aid Corp. v. Hagley,* 374 Md. 665, 685, 824 A.2d 107 (2003) (quoting *Gross v. Sussex, Inc.,* 332 Md. 247, 257, 630 A.2d 1156 (1993)).

## DISCUSSION

### I.

Bonnie contends the circuit court should have granted summary judgment in her favor on all of the Bank's fraudulent conveyance claims because the income tax refunds were tenants by the entirety property that belonged to the marital unit, not to William individually, and could not be attached by William's creditors. Therefore, it was not a fraudulent conveyance against William's creditors for the two of them to transfer their entireties property to her. She supports her contention with the same four arguments she made below. The Bank responds as it did below.

█ While some states have either abolished or significantly altered the common-law estate of tenancy by the entirety, Maryland retains the estate in its traditional form.[11] *Beall v. Beall,* 291 Md. 224, 234, 434 A.2d 1015 (1981); *Columbian Carbon Co. v. Kight,* 207 Md. 203, 208, 114 A.2d 28 (1955). The common-law incidents of estates by the entireties are that the tenants can only be and must be husband and wife; that each spouse is seized of the entire property (which can be real or personal); that each spouse is entitled to the income derived from the property and cannot encumber or dispose of it without the other spouse's consent; and, upon the death of one spouse, the other takes the whole. *Arbesman v. Winer,*

---

11. Neither party has argued to this Court, or to the court below, that another state's law governing the creation of a tenancy by the entirety is controlling. *See* Maryland Code (1974, 2002 Repl.Vol.), §§ 10–501 to 10–507 of the Courts and Judicial Proceedings Article ("CJ") (noting that, under the Uniform Notice of Foreign Law Act, a party intending to rely on the law of another state must give reasonable notice to an adverse party "either in the pleadings or by other written notice").

298 Md. 282, 288–90, 468 A.2d 633 (1983); *State v. Friedman,* 283 Md. 701, 705–06, 393 A.2d 1356 (1978).

Because entireties property is owned by the husband and wife as the marital unit, it is not subject to the claims of individual creditors of either spouse. *Schlossberg v. Barney,* 380 F.3d 174, 178 (4th Cir.2004) (applying Maryland law); *In re Bell–Breslin,* 283 B.R. 834, 836 (Bankr.D.Md.2002); *State v. One 1984 Toyota Truck,* 311 Md. 171, 187, 533 A.2d 659 (1987); *Arbesman, supra,* 298 Md. at 289, 468 A.2d 633.[12] For this reason, a creditor of one spouse may not attack as a fraudulent conveyance the transfer of entireties property by the spouses. *Van Royen v. Lacey,* 266 Md. 649, 651, 296 A.2d 426 (1972). In this case, for example, if the tax refunds were entireties property, the Wallaces could transfer the property to anyone (including Bonnie) without contravening the rights of the Bank, because the Bank never had a right to attach the property to begin with.

"A tenancy by the entireties is essentially a joint tenancy, modified by the common law theory that the husband and wife are one person." *Schilbach v. Schilbach,* 171 Md. 405, 407, 189 A. 432 (1937); *see also Schlossberg, supra,* 380 F.3d at 178. Thus, just as the creation of a joint tenancy requires the four essential common law unities of interest, title, time, and possession, so does the creation of a tenancy by the entirety. *Bruce v. Dyer,* 309 Md. 421, 427, 524 A.2d 777 (1987); *Alexander v. Boyer,* 253 Md. 511, 519, 253 A.2d 359 (1969) (citing *Eder v. Rothamel,* 202 Md. 189, 95 A.2d 860 (1953)). The husband and wife must "enjoy identical interests; enjoy identical, undivided possession; and ... the tenancy [must] commence at the same time via the same interest." *Bruce, supra,* 309 Md. at 427, 524 A.2d 777. The unities "must exist concurrently; if any one is missing, the estate cannot be one of joint tenancy," including a tenancy by the

---

**12.** Entireties property is subject to claims of a creditor of both tenants, however. *In re Carroll,* 237 B.R. 872, 874 (Bankr.D.Md.1999); *see also Phillips v. Krakower,* 46 F.2d 764, 765 (4th Cir.1931) (applying Maryland law).

entirety. *Helinski v. Harford Mem'l Hosp., Inc.,* 376 Md. 606, 615, 831 A.2d 40 (2003).

Given these requirements to create a tenancy by the entirety in Maryland, all four of Bonnie's arguments that the tax refunds were tenancy by the entirety property, as opposed to individual property of William, must fail.

### A.   The Transfer Agreement

In the 1995 Transfer Agreement, William states he has transferred all his "rights and property" from GCB "to and to be derived from him," including "wages" and "refunds," to himself and Bonnie "to be held in common during their marriage," with the survivor owning the benefits "in entirety." Bonnie maintains that this 1995 agreement had the effect of making all of William's future wages from GCB (and all tax refunds deriving from such wages) tenancy by the entirety property before William actually came into possession of the wages or refunds. In other words, having declared in 1995 that his future wages and refunds from GCB would belong to him and Bonnie as entireties property, the wages and refunds automatically became entireties property as soon as they came into existence. In oral argument before this Court, when asked whether the effect of the Transfer Agreement executed in 1995 would be to make all of William's future GCB wages tenancy by the entirety property before he ever received it, so as not to be subject to wage garnishment by his creditors, Bonnie's counsel responded in the affirmative.

As we have explained, the creation of a tenancy by the entirety requires the co-existence of unities of interest, title, time, and possession. None of these unities existed in 1995, when the Transfer Agreement was signed, with respect to the 1998 income tax refunds now at issue. William did not obtain a property interest in the refunds until 1999, when he received the refund checks, or when it was clear that he was going to receive them. *Cf.* CL § 9–203 (providing that, in the context of perfecting a security interest, attachment, and thus perfection, cannot occur as to particular collateral until the collateral itself comes into existence and the debtor has rights in it); *In*

*re Krumpe,* 60 B.R. 575, 578 (Bankr.D.Md.1986) (holding that, for bankruptcy purposes, a debtor does not acquire an interest in his wages until he earns them and, therefore, a garnishment lien divests a debtor of ownership of his wages on the day the wages are earned) citing *In re Cox,* 10 B.R. 268, 271–72 (Bankr.D.Md.(1981)).

Moreover, William did not have possession of any of his wages from GCB until they were paid and did not have possession of the 1998 income tax refunds generated by those wages until 1999, four years after the Transfer Agreement was signed. He also did not have title in the refunds until they were received; and, as is evident, the timing of the Transfer Agreement and the income tax refunds were not coterminous.

█ To be sure, a husband and wife may together come into possession of property from a third party that will be deemed tenancy by the entirety property upon receipt, so long as the four unities have been met and it is the intention of the transferor that the property be so held. *See, e.g., Young v. Cockman,* 182 Md. 246, 251, 34 A.2d 428 (1943) (holding that a conveyance to husband and wife ordinarily creates a tenancy by the entirety, although an intention clearly stated in the instrument that they shall take as joint tenants or as tenants in common will be effective); *M. Lit, Inc. v. Berger,* 225 Md. 241, 248, 170 A.2d 303 (1961) (holding that a conveyance to husband and wife gives rise to presumption that property is held as tenants by the entireties, unless the contrary is designated).

█ Likewise, a spouse who holds property individually may transfer it to the marital unit, provided the transferring spouse has the present intent to create such a tenancy. *See Diamond v. Diamond,* 298 Md. 24, 31, 467 A.2d 510 (1983); *Jones v. Jones,* 259 Md. 336, 340, 270 A.2d 126 (1970) (discussed *infra* ). Intent alone does not make property entireties property, however; the four unities of interest, title, time, and possession also must exist.

Here, none of the unities required to make William's GCB wages and tax refunds entireties property existed in 1995,

when the Transfer Agreement was executed. So, regardless of any intentions the Wallaces may have had in 1995 to declare that future GCB wages or refunds that William might come to possess would be entireties property, their intentions then were not sufficient to convert his future wages and refunds from GCB into entireties property immediately upon their coming into existence years later. Either there had to be evidence that the IRS and the Comptroller each intended, upon issuing the refund checks to William and Bonnie, that they should hold them as a marital unit (which, as we shall explain in the next subsection, there was not), or there had to be evidence that, upon receipt of the refund checks, William intended to transfer those monies to the marital unit. There was no evidence that William did anything, however, that would evidence a present intention to transfer his individual tax refunds to the marital unit. For example, there was no evidence that William deposited the refund checks in a marital bank account or used the refund checks to purchase entireties property. The only evidence was that he transferred the tax refunds to Bonnie, alone.[13]

Accordingly, because the unities required to create entireties property in the tax refunds did not exist, the tax refunds were not entireties property. We note, too, that any other conclusion would wreak havoc with the laws of garnishment; there is no legally viable basis for Bonnie's assertion in this case that spouses can years in advance declare their future wages entireties property, and thereby insulate the wages, before they even are paid, from garnishment by creditors of one spouse.

## B. The Jointly Issued Tax Refund Checks

In *McClelland v. Massinga*, 786 F.2d 1205, 1209 (4th Cir. 1986), the United States Court of Appeals for the Fourth

---

**13.** As we explain in addressing Question II, if, upon receiving the refunds, William had deposited the checks in an entireties account, that transfer would have been a constructive fraudulent conveyance, unless it was for fair consideration, because he was insolvent.

Circuit, applying Maryland law, held that the Comptroller's issuance of a state income tax refund check in the names of a husband and a wife did not create a tenancy by the entirety in the refund monies. In that case, a number of fathers whose state income tax refunds were intercepted to be applied to delinquent child support obligations sued state authorities, alleging due process violations. In addition, two current wives of two of the fathers sued, alleging that the income tax refunds were entireties property that could not be attached. Both of the wives did not earn any income in the tax year in question; the refunds all were of overwithholding on their husband's salaries.

In holding that the refunds were *not* entireties property (and therefore the wives lacked standing to join in the due process challenge), the Fourth Circuit relied on two Maryland Court of Appeals cases. In *Jones, supra,* 259 Md. 336, 270 A.2d 126, a husband and wife retained a lawyer to represent them in connection with an automobile accident in which the wife was injured. The wife's claim was for damages for personal injuries and the husband's claim was for reimbursement for medical expenses he paid for his wife.

Eventually, the case was settled, but not before the pair separated. A single settlement check was issued, payable to the wife, the husband, and their lawyer. The wife filed a declaratory judgment action, asking the court to determine ownership of the funds. The husband maintained that the funds were entireties property, and therefore could not be apportioned. The Court of Appeals held that to create entireties property there must be evidence of a discernible intent to transfer property previously held by an individual to the marital unit. For example, when a spouse purchases real estate and directs that it be titled as tenants by the entireties, "he has manifested a positive intent to create the estate." *Id.* at 340, 270 A.2d 126. Likewise, when one spouse creates a bank account and directs that it be titled as tenants by the entireties, or purchases chattel and so directs, an intent to create the estate can be determined. *Id.; see Haid v. Haid,* 167 Md. 493, 175 A. 338 (1934) (intent to create entireties

property may be presumed when one spouse insists that property be titled in name of husband and wife); *Baker v. Baker*, 123 Md. 32, 90 A. 776 (1914) (intent to create tenancy by the entirety property may be presumed when spouse creates joint bank account with other spouse).

The *Jones* Court concluded that, when a husband and wife have separate but related claims arising out of a single accident, "[t]he act of obtaining an attorney to represent them both falls far short of being evidence of [an intent to transfer the settlement proceeds to the marital unit]." 259 Md. at 341, 270 A.2d 126.

In *Diamond, supra*, 298 Md. 24, 467 A.2d 510, an insurance company issued a check payable to a husband, his wife, and their lawyer, in settlement of the husband's claim for personal injuries and their joint claim for loss of consortium. The issue in the case was whether the settlement money, or any part of it, was entireties property that could not be attached by a judgment creditor of the husband. The Court, citing *Jones*, explained that "to create a tenancy by the entireties there must be evidence of an intent to transfer property previously held by an individual to the marital unit," *id.* at 31, 467 A.2d 510, and concluded that there was nothing in the factual situation at hand to indicate an intention by the transferor insurance company or the husband and wife to create entireties property. The Court commented that, in both cases, "there was no apportionment of the claims; yet there also was no indication of an intent to create a tenancy by the entireties in the check." *Id.* at 32, 467 A.2d 510. Accordingly, the husband's share of the settlement funds was attachable. *See also Newborn v. Newborn*, 133 Md.App. 64, 94 n. 13, 754 A.2d 476 (2000) (noting that "[h]ere, there was no evidence that the insurance company issuing the settlement check did so with the intent to merge the claims of each party and transfer all the funds to the parties as a marital unit. Thus, a tenancy by the entireties will not be assumed.").

The Fourth Circuit in *McClelland, supra*, 786 F.2d 1205, concluded that there was no evidence that the State, as payor

of the tax refunds to the husbands for their overwithheld income tax payments, intended to create a tenancy by the entireties estate in the refund monies. To the contrary, the State issued the refund check to the husband and wife "simply to assure that each party received such of the refund as he or she by his or her contribution, was entitled to receive on the basis of his share in the overpayment." *Id.*

Under the holding in *McClelland,* the Wallaces did not receive the state income tax refund check as tenants by the entireties. Likewise, entireties property was not created in the federal income tax refund when the IRS issued a check to the Wallaces jointly. *Cf. Rosen v. United States,* 397 F.Supp. 342, 343 (E.D.Pa.1975) (stating that "[s]pouses filing a joint return have separate interests in any overpayment, the interest of each depending on his or her income").

### C. The "Married Filing Jointly" Tax Status

So too William and Bonnie did not create a tenancy by the entirety in either the federal or state tax refund checks by virtue of their "married filing jointly" tax status. In discussing Maryland state income tax returns, the Court in *McClelland, supra,* noted that the mere filing of a joint tax return by a husband and wife does not render the property taxed, or the tax paid, joint property or property held as tenants by the entirety. Furthermore, the *Rosen* court stated that "the filing of a joint [federal income tax] return does not have the effect of converting the income of one spouse into the income of another," and that "a joint income tax return does not create new property interests for a husband or wife in each other's income tax overpayment." 397 F.Supp. at 344. *See also U.S. v. Elam,* 112 F.3d 1036, 1038 (9th Cir.1997) (stating that "[a] joint return does not itself create equal property interests for each party in a refund"); *In re Alden,* 73 B.R. 215, 216 (Bankr.N.D.Fla.1986) (holding that " 'the mere fact that the tax return was a joint tax return by the debtor with his non-debtor spouse did not create a tenancy by the entireties ownership interest in the tax refund' ") (quoting *In the Matter of Crum,* 6 B.R. 138 (Bankr.M.D.Fla.1980)).

### D. Loss Carry–Forward

Finally, Bonnie argues that a tenancy by the entireties was created in the tax refunds because William's withholding from his salary at GCB was an overpayment only because Bonnie claimed a loss carry-forward from her subchapter S corporation. Even assuming this fact to be true, it would not have the effect of making the tax refunds entireties property. At most, it could mean that some portion of the refunds was attributable to Bonnie, and not to William, and therefore would not be subject to attachment by William's creditors. *McClelland, supra,* 786 F.2d at 1210 (" '[A]n overpayment is apportionable to a spouse to the extent that he or she contributed to the overpaid tax.' ") (quoting *Gens v. United States,* 222 Ct.Cl. 407, 615 F.2d 1335, 1342 (1980)); Rev. Rul. 74–611, 1974–2 C.B. 399 ("[A] joint income tax return does not create new property interests for the husband or the wife in each other's income tax overpayment.").

Bonnie did not make an apportionment argument below, and she did not present any evidence on the summary judgment record that could have supported an apportionment finding. Her sole argument was and is that the use of her loss carry-forward converted the tax refunds into entireties property. For the reasons we have explained, that argument lacks merit.

### II.

Bonnie contends the circuit court erred in granting summary judgment to the Bank because there was a genuine dispute of material fact as to whether William received fair consideration for the income tax refund transfers. Specifically, she argues that the affidavits and discovery responses she submitted in opposition to the Bank's motion showed that she spent all or at least some of the tax refunds on "family support" or to satisfy "antecedent debts." Accordingly, whether there was fair consideration for the transfers was a disputed question of fact that should not have been decided on summary judgment.

The Bank responds that the evidence did not generate a genuine dispute of material fact on the issue of fair consideration because the common law doctrine of necessaries (and its statutory counterpart) was abolished by the Court of Appeals in *Condore v. Prince George's County,* 289 Md. 516, 425 A.2d 1011 (1981); therefore, a spouse's purchase of family necessaries is no longer fair consideration, and thus the transfers were constructive fraudulent conveyances. In the alternative, the conveyances were nevertheless constructively fraudulent because they were not made for fair value (*i.e.,* Bonnie did not spend all of the money on family necessaries) or were not made in good faith (*i.e.,* Bonnie received the money with the intent to defraud William's creditors).

As noted above, CL section 15–204 governs constructive fraudulent conveyances. It provides that "[e]very conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." *Id.*

Under the MUFCA, "fair consideration" is given for property or an obligation if:

(1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or

(2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

CL § 15–203.

Thus, in the absence of proof of actual intent by an insolvent debtor to hinder, delay, or defraud future creditors by conveying property, he will be presumed to act with that intent, unless " 'for a fairly equivalent consideration, whether presently arising or being in satisfaction of an antecedent debt, [he] transfer[s] in good faith all or part of his property to one of his creditors.' " *Nat'l Mortgage Warehouse, LLC v. Trikeriotis,* 201 F.Supp.2d 499, 502 (D.Md.2002) (quoting *Long v.*

*Dixon,* 201 Md. 321, 323, 93 A.2d 758 (1953)); *see also Kennard v. Elkton Banking & Trust Co.,* 176 Md. 499, 504, 6 A.2d 258 (1939). The intent of the transferee "is determinative only if the transfers made to [him] were fair consideration in satisfaction of a bona fide debt." *Nat'l Mortgage Warehouse, supra,* 201 F.Supp.2d at 503.

### A. Pertinent Evidence in the Summary Judgment Record About Fair Consideration

On May 21, 1999, the Bank took William's deposition in aid of enforcement in the Debt Action. He testified that he was receiving $1,000 per month in unemployment compensation, which he placed in his bank account in his own name at the First National Bank of North East. No other funds were deposited into that account. William further testified that Bonnie receives money as income but he has no knowledge of where from. He claimed that he did not know, and had never known, what investments Bonnie has. Her investments and bank accounts are in her own name. "She has her own independent assets and her own income. I've never examined it. It's none of my business." He added that Bonnie "pays the rent and other things. Always has."

Bonnie's deposition in aid of enforcement in the Debt Action was taken on March 31, 2000. She testified that she does not know where her husband banks. For their entire 13 years of marriage, they "always kept [their] finances completely separate[,]" meaning that she has her "own personal money, [her] own investments" that William has "never been involved in, had no knowledge of, made decisions on," and that the same holds true for him. She testified that "zero" monies from William were deposited in her CMA account over the past year, except for the tax refunds. The tax refunds were deposited in her CMA account because she "was paying all the bills and ... needed funds to pay the bills with, and that's the active account that [she] had." Bonnie owns stocks and bonds that are kept in accounts in her own name.

In the case at bar, Bonnie filed supplemental interrogatory answers on October 23, 2003, setting forth how the income tax

refunds were spent in May and June of 1999: $6,000 was paid to William's lawyer; approximately $1,500 was taken in cash from ATMs; $2,250 was paid to the New London Presbyterian Church for "organization fees"; $1,500 was paid to the Wallaces' landlady for rent; slightly more than $1,100 was paid to the private school attended by one of the Wallaces' sons, some of which was for a "pledge"; $1,000 in checks were made out to William; $800 was paid to a CPA for preparing personal tax returns; about $600 was paid for food. The Wallaces' cleaning lady was paid $700; about $500 was spent on "home maintenance" (to stores such as Home Depot) and $250 was spent on lawn care; a little over $400 was placed in Bonnie's stock trading account. About the same amount was paid for food, gas, and lodging and a camera for a trip to Virginia. More than $100 was spent on Bonnie's trip to visit her brother; about $300 was paid to a community college for William's adult son, and to that son directly; about $460 was paid for gas and electric and telephone; a little over $200 was spent on toys, activities, and books for the children; $210 was spent on clothing; $163.69 was spent on automobile maintenance; sitters for the children were paid $47. The remaining expenses were for miscellaneous items, some for the children.

In her answers to interrogatories, Bonnie explained that she made payments to William because he

is [her] dependent husband ... [she] gave him approximately $500 a month [from the income tax refunds], which was used for family support. The cash was given to William ... for the following family support: 1) gas for [her] automobile that [he] drove; and 2) support for sons, William and James, Cecil County municipal soccer program.

Also, the cash given to William was used for food and gas, hair cuts for family members, the children's allowances, sitters for the children, support for Terry Wallace, support for their son William in the form of money to his boy scout troop and camp, and support for their sons' recreation programs. She also answered that all of the payments she made from the tax refunds were "used to support the family."

At her deposition in this case on November 12, 2003, Bonnie was questioned extensively about how the tax refunds were spent in April, May, and June of 1999. She testified that she did not know then that William had a bank account. She assumed that he used the checks she gave him from the CMA account for "family support," but did not know how he translated the checks into cash. She did not have any documentary evidence about how he spent the money. She testified that she used the ATM cash to buy food, gas, and snacks for the children, but she did not have any documents to show that that was how the money was spent.

### B. Family Support as Fair Consideration

At common law, under coverture and other legal disabilities, a married woman did not have a separate legal existence but was considered to be merged with her husband into one legal person. Married women could not own property, enter into contracts, devise property, sue individually, or use their own credit. Also under the common law, as an outgrowth of coverture, "the husband had a legal duty to supply his wife with necessaries suitable to their station of life, but the wife had no corresponding obligation to support her husband, or supply him with necessaries, even if she had the financial means to do so." *Condore, supra,* 289 Md. at 520, 425 A.2d 1011; *see also* Margaret Dearden, Note, *Condore v. Prince George's County—Is the Necessaries Doctrine Necessary?,* 41 Md. L.Rev. 527 (1982).

The common-law doctrine of necessaries was an enforcement mechanism for the husband's duty to support his wife. At common law, "[t]he husband had an obligation of support, which was to furnish necessaries to the wife. If he did not, her remedy was to purchase the necessaries on his credit." *Ewell v. State,* 207 Md. 288, 292, 114 A.2d 66 (1955). The creditors could look to the husband's resources to satisfy the debt incurred by the wife. Because the right of a wife to support from her husband depended upon the marriage relation, not upon whether she in fact had adequate means, " '[h]er implied authority to pledge his credit spr[ung] from

his obligation, as husband, to provide for her, and not from the fact that otherwise she [would] be destitute.'" *Id.* at 293, 114 A.2d 66 (quoting *McFerren v. Goldsmith–Stern Co.*, 137 Md. 573, 113 A. 107 (1921)). "Necessaries" were items "suitable to [the wife's] situation and [the husband's] circumstances in life." *Vaccarino v. Cozzubo*, 181 Md. 614, 617, 31 A.2d 316 (1943).

Also under the common law, "the father was primarily liable for the support of his minor children." *Rand v. Rand*, 280 Md. 508, 510, 374 A.2d 900 (1977). A mother's support obligation was subordinate, in that it existed only to the extent that the father was financially incapable of supporting the children himself. *See Ross v. Hoffman*, 280 Md. 172, 176, 372 A.2d 582 (1977).

In the late 1800s, Maryland, like many other states, enacted laws designed to place married women on a more equal legal footing with their husbands. Maryland's "Married Women's Acts" of 1892 and 1898, among other things, granted wives the right to own property and enter into contracts as if they were not married and protected the property of a married woman from being used to satisfy the debts of her husband. *See* 1892 Md. Laws., ch. 267; 1898 Md. Laws, ch. 457. The Married Women's Acts preserved the doctrine of necessaries, however, by stating that nothing in the Acts was to be construed as eliminating a husband's common-law liability for debts incurred or entered into on credit by his wife for necessaries for herself and their children. 1898 Md. Laws, ch. 457, § 20.

The Acts also included a statute concerning transfers of property between spouses. Specifically, it provided that a transfer of property between spouses is invalid if made in prejudice of the rights of present creditors. *Id.* at § 1 (current version at Md.Code (1984, 2004 Repl.Vol.), § 4–301(d)(2)(i) of the Family Law Article ("FL")).

At around the same time, in 1896, Maryland enacted criminal statutes for non-support of wives and children. The statutes made it a misdemeanor for a person to "without just cause desert or wilfully neglect to provide for the support and

maintenance of his wife and minor child." 1896 Md. Laws., ch. 73. These statutes later were recodified in Article 27, section 88, which was divided into two parts, one addressing non-support of the person's wife, and the other non-support of his child. *See* Md.Code (1957, 1976 Repl.Vol.), Art. 27, § 88. While one purpose underlying the criminal non-support laws was to protect wives and children from becoming public charges, the primary objective was "to provide directly for unsupported wives and children, and to punish this offense [of non-support] against them, and by fear of punishment to prevent the committing of such offenses." *Ewell, supra,* 207 Md. at 295, 114 A.2d 66 (quoting *State v. Moran,* 99 Conn. 115, 121 A. 277 (1923)).

Also, in 1951, Maryland enacted a law stating that the parents of a minor child, as the child's joint natural guardians, both are responsible for the child's support. Nevertheless, Maryland courts continued to apply the common-law rule that the father was primarily responsible in deciding child support disputes. *Rand, supra,* 280 Md. at 511, 374 A.2d 900.

In 1972, the people of Maryland ratified the Equal Rights Amendment ("ERA"), which is now article 46 of the Declaration of Rights. It states: "Equality of rights under the law shall not be abridged or denied because of sex." *Id.* Passage of the ERA produced a series of appellate cases declaring unconstitutional the common-law principles we have just discussed, which applied the law differently on the basis of gender, as well as legislative changes to the law that were prompted by these judicial decisions, or in anticipation of more to come.

In 1977, in *Rand, supra,* 280 Md. 508, 374 A.2d 900, the Court of Appeals held that the ERA made unconstitutional the common-law rule imposing on the father of a minor child the primary obligation of support. The Court declared that both parents are to share, in accordance with their means, the duty for child support. *Id.* at 516, 374 A.2d 900; *see also Elza v. Elza,* 300 Md. 51, 475 A.2d 1180 (1984) (abolishing the com-

mon-law maternal preference for custody of children of tender years).

Soon thereafter, in *Coleman v. State,* 37 Md.App. 322, 377 A.2d 553 (1977), this Court held the statute criminalizing non-support of a spouse unconstitutional under the ERA, because it penalized only men who refused to support their wives (and not women who refused to support their husbands). In 1978, the General Assembly amended the criminal non-support statutes to place responsibility for family support on both spouses. *See* 1978 Md. Laws, ch. 921 (current versions at FL §§ 10–201, 10–203).

In 1980, following up on *dicta* by this Court in a 1973 case suggesting that the alimony statute construed by the courts to impose a support obligation only on husbands was unconstitutional, the General Assembly amended the statute to allow either spouse to recover alimony. *See* 1980 Md. Laws, ch. 575; *Minner v. Minner,* 19 Md.App. 154, 310 A.2d 208 (1973).

In 1981, in *Condore, supra,* 289 Md. 516, 425 A.2d 1011, the Court of Appeals held that the ERA rendered the common-law doctrine of necessaries unconstitutional. By then, the statute codifying the common-law doctrine appeared in Maryland Code (1957, 1980 Repl.Vol.), Article 45, section 21. In the *Condore* case, Prince George's County sued a wife for payment of hospital bills incurred for services rendered to her husband (who died before being discharged from the hospital). The circuit court granted summary judgment in favor of the hospital, ruling that the ERA had the effect of modifying the common-law necessaries doctrine to impose a corresponding legal obligation on wives to pay for their husbands' necessaries.

The Court of Appeals reversed. It held that, as a consequence of the ERA, the "ancient necessaries doctrine ... is no longer part of the common law of this State and that neither the husband nor the wife is liable, absent a contract, express or implied, for necessaries such as medical care supplied to the other." *Id.* at 532–33, 425 A.2d 1011. The Court concluded that, if the doctrine were to be revived by imposing upon

wives a reciprocal liability for necessaries (*i.e.* a new cause of action), that was best left to the legislature to do. Ultimately, in 1989, the General Assembly declined to create such a cause of action, and repealed the already-void statutory codification of the doctrine.[14]

The result of these court rulings and legislative enactments was to alter fundamentally the legal responsibilities of spouses toward each other, and of parents toward their children, in Maryland. Now, both spouses in a marriage owe a legal duty to the other spouse to refrain from willful non-support when they are capable of providing support. Mothers and fathers are jointly and severally responsible for their children's support, care, nurture, welfare, and education. *See* FL § 5–203(b)(1). A spouse cannot pledge the credit of the other spouse for necessaries for the family, without the other spouse's agreement. A creditor of a spouse who owes a debt upon purchase of family necessaries has recourse against only the contracting spouse, not against the other spouse.

Bonnie's argument in this case is that William received fair consideration for his transfer of the tax refunds to her because she used the money to satisfy *his* legal obligation to support *her and their children,* *i.e.,* for "family support." With respect to the sums she paid back to him—about $1,000—she seems to be taking the position that she was using them to satisfy *her* legal obligation to support *him.* The predicate for Bonnie's "family support" argument is *Pearce v. Micka,* 62 Md.App. 265, 489 A.2d 48 (1985).

In *Pearce,* a husband was rendered insolvent when a former client obtained a large judgment against him in a legal malpractice case. He was disbarred in late 1980 and did not work thereafter. He and his wife owned a home together. In 1979

---

**14.** By then, the statute retaining the doctrine of necessaries, while declared unconstitutional and thus void, had been recodified in the Code revision process, in 1984, to section 4–302 of the Family Law Article. The 1989 Md. Laws, ch. 360, noted that House Bill 38, which repealed FL section 4–302, was for the purpose of "repealing the doctrine of necessaries that imposes liability on a husband," and would "eliminate the necessaries doctrine in its entirety."

and 1980, he made payments on the mortgage from funds in his law firm checking account. In 1981, he made cash payments on the mortgage from sums borrowed from friends and relatives. Also, from 1979 to 1981, he made cash deposits of money into his wife's checking account, totaling $6,000.

The primary issue in the case was whether the husband's transfers of his own money to pay the mortgage on the family home were fraudulent conveyances.[15] A secondary issue, and the one that is of significance here, was whether the trial court erred in ruling that the husband's transfers to his wife were not fraudulent conveyances. We determined that there was evidence in the record to support the trial court's finding that the wife spent the $6,000 "for food, clothing, shelter and other necessaries for the debtor and his family[,]" and addressed the issue in one paragraph:

> We agree with the chancellor's decision that deposits of money used by [the husband] to support his family did not constitute fraudulent conveyances because, within the meaning of the Uniform Act, there is "fair consideration" for the payment of money by a debtor to satisfy his obligation to provide necessaries to his wife and children. Nor do such expenditures constitute interspousal transfers of property to the prejudice of creditors.... Providing necessaries for a family is not a transfer of property from one spouse to another.

*Id.* at 278, 489 A.2d 48. (We have omitted internal citations that were to provisions of the MUFCA we have cited above.)

In the intervening 20 years, this holding has been cited but never directly applied; that is, there has been no case in which a spouse has successfully argued that a transfer of money from the other spouse, when the other spouse was insolvent, was "fair consideration" because the money transferred was used to purchase household basics for the family. *See Molo-*

---

15. We held that the transfers were fraudulent to the extent that they reduced the principal indebtedness, but not to the extent that they went to bona fide creditors, such as the county (for property taxes), the mortgagee (for interest), and the insurer of the property (for premiums).

*vinsky v. Fair Employment Council of Greater Wash., Inc.,*
154 Md.App. 262, 277–78, 839 A.2d 755 (2003) (stating the
holding in *Pearce* but affirming finding of fraudulent convey-
ance when there was no evidence that transfers were used for
family support).

Courts in other jurisdictions that have addressed the issue
of whether an insolvent debtor's transfer of property (includ-
ing money) to a family member when the debtor has a legal
obligation to support the family member is fair consideration,
within the meaning of fraudulent conveyance law, have not
reached the same conclusion that we did in *Pearce*.

In *Carneal v. Leighton,* 237 F.Supp.2d 104 (D.Me.2002)
(applying the Maine Uniform Fraudulent Transfer Act), the
court expressly disapproved of the holding in *Pearce*. There,
an insolvent husband and his wife and children were living
together as an intact family. The husband transferred a
$5,000 mutual fund to his wife, who used the money to pay for
household expenses, including for support of their minor chil-
dren. The husband's creditor alleged that the transfer was a
constructive fraudulent conveyance because it was not for fair
consideration. Citing *Pearce*, the wife argued that, because
the sums were used to pay household expenses for the family,
the husband received fair consideration.

The court rejected the wife's argument because it ignored
the fact that she had an equal legal obligation to provide
family support:

> Because Mr. and Mrs. Leighton are married, the payment
> of the household expenses and support of the children are as
> much Ann Leighton's responsibility as Frederick Leigh-
> ton's. This is not a situation where the Leightons are
> divorced and there is a legally cognizable child support
> obligation. Ann Leighton's payments for the household
> expenses and support of the children does not constitute
> reasonably equivalent value for the transfer of the mutual
> funds.

*Id.* at 110. Quoting a Maine fraudulent conveyance case
setting aside an insolvent father's transfer of assets to his son

in exchange for the son's promise to use income from the assets to satisfy the father's duty to support his wife (with whom the father still lived), the court stated: " '[I]f one steals in order to provide for one's family, it is no less a theft. In the same way, if one transfers assets while insolvent in order to provide for one's family, it is no less a fraudulent transfer.' " *Id.* (quoting *Morin v. Dubois,* 713 A.2d 956, 959 (Me.1998)).

The New York federal and state courts, applying the New York Debtor Creditor Act, also have drawn a distinction between intact families, in which there is an ongoing reciprocal support obligation between the spouses and on both of their parts toward their children, and separated and divorced families, in which those obligations have been set by agreement or court order. In *United States v. Mazzeo,* 306 F.Supp.2d 294 (E.D.N.Y.2004), the government, a creditor of an insolvent husband, sued the wife alleging, *inter alia,* that the husband's transfers of assets to her, including monies spent to improve their homes, were constructive fraudulent conveyances. The husband and wife were living in an intact family. The wife took the position that there was fair consideration for the transfers because the husband had a legal duty of spousal support that was the equivalent of an antecedent debt; that is, he owed her a duty of support, and that duty arose before the insolvency.

The court rejected that argument, holding that there was "no basis under New York law to conclude that a husband owes an antecedent debt for the purposes of [the New York statute]'s definition of fair consideration *solely* based on the existence of a marital relationship." *Id.* at 309. The court distinguished cases in which property was transferred by an insolvent debtor spouse to the other spouse when the spouses were separated and the transfers were pursuant to separation agreements. *See Fed. Deposit Ins. Co. v. Malin,* 802 F.2d 12, 19 (2d Cir.1986) (holding that there was fair consideration for a conveyance by an insolvent debtor husband to his ex-wife because the debtor had an obligation to make the conveyance pursuant to a separation agreement); *Safie v. Safie,* 17 N.Y.2d 601, 268 N.Y.S.2d 561, 215 N.E.2d 682 (1966) (holding that,

when insolvent debtor husband and wife were separated for four years, and had entered into prospective separation agreement, transfer of assets by husband to wife was fair consideration because it was in satisfaction of an antecedent debt).

The court explained that "[t]he key here is that the precedents [relied upon by the wife] all concern the debt owed a spouse *as the result of a separation or divorce agreement,* that is, during the dissolution or anticipated dissolution of a marriage, and do not concern the ongoing duty of support in an intact marriage, as here.... It is certainly sensible to treat intact marriages and dissolving marriages differently from this standpoint, and it is hardly surprising that New York law does so." 306 F.Supp.2d at 309–10. The court continued:

[Under a rule allowing spousal support to be taken automatically as an antecedent debt and thus constituting fair consideration,] "any spouse could transfer substantial assets to the other spouse and simply call it a transfer in return for consideration and shelter the assets from creditors. There is no such loophole. As the Court of Appeals for the Second Circuit explained in a related context, [under such a rule], a potential spouse 'could empty his estate with impunity when sued by victims, transfer his property to his fiancé and receive nothing but inchoate interests in return— nothing from which [a creditor] could recover its judgment- and yet enjoy the benefits of the property now nominally owned by his wife. That is the sort of injustice fraudulent conveyance law is designed to prevent.' "

*Id.* at 310 (quoting *In re Manshul Construction Corp.,* 2000 WL 1228866, *49 (S.D.N.Y.2000) (in turn quoting *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1059 (2d Cir.1995))).

Likewise, in *ESB, Inc. v. Fischer,* 185 N.J.Super. 373, 448 A.2d 1030 (1982), the court rejected an argument that an insolvent husband debtor did not fraudulently convey property to his wife. The husband and wife were in an intact marriage when the husband transferred his interest in certain real estate to his wife. In defending a fraudulent conveyance action by the husband's creditor, the wife argued, *inter alia,*

that the transfer was for fair consideration because it was given in exchange for her relinquishing all right to future support from the husband. The court rejected that argument, stating:

> The wife acknowledges that her husband provided such support as he was able both before the conveyance and thereafter. If, without any objective manifestation of a change in support arrangements, consideration for interspousal transfers could be based merely on a claim that the wife no longer looked to the husband for support, the Uniform Fraudulent Conveyance Act could be rendered nugatory in any stable family setting. As between husband and wife, the parties may agree that she will first look to her own resources and then to the husband's transferred interest in the property to satisfy a support claim; but where the rights of a third party, such as [the creditor] here, are brought into question, a transfer of property from husband to wife based on a release of husband's obligation to support his wife cannot stand.

*Id.* at 378, 448 A.2d 1030.[16]

Also instructive is *Brown v. Borland,* 230 Neb. 391, 432 N.W.2d 13 (1988), in which an insolvent debtor husband transferred his interest in the family's home to his wife. The transfer was made in exchange for a promise by the wife to assume paying the full remaining indebtedness on the home. The court held that the transfer was not made for fair consideration, because the husband and wife were jointly and severally obligated on the loan, and therefore the wife already was obligated to pay the full loan amount.

For our analysis, it also is important to take into account that there are provisions of Maryland law under which a

---

**16.** In *Bruce v. Dean,* 149 Va. 39, 47, 140 S.E. 277 (1927), the court held that a debtor father who was about to start serving a life sentence for murder did not make fraudulent conveyances of money he paid to a school his children were to attend. The court held that there was fair consideration for the transfer, because the school agreed to assume the obligation to support the children.

debtor may claim exemptions from attachment of property and wages, and thus keep assets and wages to use for support. Exemptions from attachment of property of the debtor (other than wages) include up to $5,000 worth of items necessary to practice the debtor's trade or profession; money payable in the event of sickness, accident, injury or death of any person (*e.g.*, a worker's compensation award); up to $1,000 in "household furnishings, household goods, wearing apparel, appliances, books, animals kept as pets, and other items that are held primarily for the personal, family, or household use of the debtor or any dependent of the debtor"; cash or other property up to $6,000 in value; and retirement benefits.[17]  CJ § 11–504 (2004 Supp.).  Also, there is an exemption from wage attachment of at least 75% of a debtor's disposable wages (that is, the "part of wages that remain[s] after deduction of any amount required to be withheld by law") and any medical insurance payment deducted by the employer per pay period. CL § 15–601.1.

The purpose of these exemptions is to protect debtors and their dependents from being deprived of means of support. In *Schumacher & Seiler, Inc. v. Fallston Plumbing, Inc.*, 91 Md.App. 696, 700, 605 A.2d 956 (1992), this Court, in determining whether exemptions apply to corporations or only to natural persons, reviewed the debates in the General Assembly from 1851, in which the purpose of exemptions from execution were discussed.[18]  One delegate noted: "[I]t is our duty so to provide as to prevent the greatest amount of suffering and want to the debtor, *and those helpless ones who may be dependent on him,* and at the same time work the least amount of evil to the creditor."  *Id.* at 699, 605 A.2d 956 (quoting 1 *Debates and Proceedings of the Maryland Reform Convention to Revise the State Constitution* 408 (1851) (em-

---

17.  There are additional exemptions for real and personal property if the debtor is filing Chapter 11 bankruptcy.

18.  The Maryland Declaration of Rights, article III, section 44, provides that "[l]aws shall be passed by the General Assembly, to protect from execution a reasonable amount of the property of the debtor."

phasis added)). We commented that the "rationale [for exemptions from execution] is usually a subsistence core to protect debtor and dependents." *Id.* at 701, 605 A.2d 956 (quoting Aaron, *Bankruptcy Law Fundamentals* § 7.01 (1991)). The exemption statutes thus strike a balance by providing a means for a debtor to satisfy the judgment against him while also satisfying his obligation to support his dependents.

We return now to the holding in *Pearce v. Micka, supra,* and the question of whether, in this case, there was any evidence adduced on the summary judgment record that William received fair consideration from Bonnie for his transfer of his $22,805 in tax refunds to her. We note first that, notwithstanding the language in *Pearce,* the MUFCA defines "conveyance" to mean "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." CL § 15–201(c). William's transfer of his ownership interest in the tax refunds to Bonnie plainly was a conveyance under that definition. There is nothing in the MUFCA that makes a transaction that otherwise is a conveyance not a conveyance merely because it is a transfer from one spouse to the other. We have found no case in the United States that has so held. To the contrary, the cases are legion that transfers between spouses are conveyances that, like transfers between a debtor and any close family member, should be closely scrutinized for fair consideration. *See, e.g., Neshewat v. Salem,* 365 F.Supp.2d 508, 522 (S.D.N.Y.2005); *In re Harper,* 132 B.R. 349, 354 (Bankr.S.D.Ohio 1991); *Speiser v. Schmidt,* 387 Pa.Super 30, 37–38, 563 A.2d 927 (1989).

The parties do not dispute that William was insolvent when he conveyed the tax refunds to Bonnie. In her interrogatory answers and deposition, Bonnie attested that *all* the expenditures she made from the tax refunds were for "family support" or "necessaries." Without question, the evidence showed that at least some of the money Bonnie spent was for "necessaries," that is, food, rent, and gas and electricity. (Many of the other expenditures either clearly were not for

"necessaries," or whether they constituted "necessaries" is in controversy.) The circuit court was wrong, then, in finding that Bonnie presented no evidence whatsoever that any of the tax refund money was spent on necessaries for the family. The question as we see it, however, is whether the fact that Bonnie used some of the money transferred to her by William for basic support items for their family was material to the issue of fair consideration. We conclude that it was not. To the extent that the brief, secondary holding in *Pearce v. Micka* is inconsistent with this conclusion, we disapprove of it.[19]

When William conveyed the tax refunds to Bonnie, they were living in an intact family with their children. They both had an equal and complete obligation to support the children that was joint and several. Their situation was not as it was for parents pre-*Rand*, when the father had a primary duty of support. Moreover, both William and Bonnie had a legal obligation not to willfully fail to support the other, if capable of rendering support. Their situation was not as it was pre-*Condore*, when it was the husband's sole and non-reciprocal legal duty to support his wife by furnishing necessaries for her and their children. Rather, Bonnie had the same obligation to support the children and to support herself and William as he had to support Bonnie, the children, and himself. The payment of household expenses and support of the children was as much Bonnie's duty as it was William's duty.

In that circumstance, Bonnie's payment of household expenses was not fair consideration for William's transfer to her of the tax refunds. Bonnie already was obligated to provide support for the children, William, and herself; she used the money she received from him to satisfy her own obligation. That cannot have been fair consideration to William. There was no evidence adduced to show that Bonnie was herself incapable of meeting her support responsibilities. Indeed, the

---

**19.** We note that, while *Pearce* was decided after the *Condore* case abolished the doctrine of necessaries, almost all of the transfers at issue in that case took place before *Condore* was decided, when the necessaries doctrine was still alive and well in Maryland.

only evidence generated in the summary judgment record on that point showed that Bonnie had her own income from which she routinely paid household expenses (including, in particular, the rent, which in May and June 1999 she proceeded to pay out of the tax refunds, not her own income).

If Bonnie's use of the tax refunds conveyed to her by William could be fair consideration to William, by satisfying a legal support obligation that she shared jointly and severally with him, husbands and wives could easily circumvent the exemption laws and make conveyances benefitting each other and depriving their creditors.

Here, if William had kept drawing a salary from GCB, and the Bank had garnished his wages, at least 75% of his disposable wages would have been exempt from attachment, and could have been used by him, directly, for family support. If William had deposited the tax refund checks into his own bank account (as he had done the year before, prior to the judgment in favor of the Bank), and the Bank had attached the account, he could have claimed an exemption of up to $6,000 to use for family support. If William had deposited the money and there had been no effort by the Bank to attach it, he could have used it to buy goods and services (including those that would benefit his family), because he would be receiving fair consideration for the transfers of money used to purchase the goods or services (and the providers would be acting in good faith, assuming they did not know of his insolvency).

Instead of doing any of these things, William transferred the tax refund money to Bonnie, thus insulating it from attachment by the Bank. Bonnie could have kept the money or spent it on anything she wanted. To the extent that she spent some of the money on household goods, rent, and other family basics, she was satisfying her own responsibility to provide for her family, not William's responsibility.

Finally, in the most circular of her arguments, Bonnie maintains that the $1,000 she gave to William out of the refund money he conveyed to her was to satisfy her obligation to support him, as he was destitute and could not support

himself. Obviously, Bonnie's use of the money to discharge her duty to support William was not fair consideration to William for his transfer of his money to her to begin with. Rather, it was a transparent means to circumvent the exemption laws, which would allow William to retain funds to support himself and his family.

### B. Payment Of William's Attorney's Fees

As noted above, Bonnie spent $6,000 of the tax refunds to pay an attorney who represented William. Her primary argument to the circuit court respecting this payment was that it was a family "necessary." She made the alternative argument, which has become her primary argument on appeal, that the payment was in satisfaction of an antecedent debt, and therefore was fair consideration to William.

The summary judgment record discloses only that the legal fees in question arose when William "had been sued in Massachusetts by Christian Book Distributors . . . [which] took a judgment against [William] for over a million dollars" in 1999.

A "property or obligation [ ] received in good faith to secure . . . antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained" is fair consideration. CL § 15–203; *see Drury v. State Capital Bank of E. Shore Trust Co.,* 163 Md. 84, 90–91, 161 A. 176 (1932); *see also Sullivan v. Dixon,* 280 Md. 444, 449, 373 A.2d 1245 (1977) (holding that an antecedent debt of a grantor or mortgagor constitutes fair consideration for a conveyance to a creditor, but the antecedent debt of a third person does not); *Berger v. Hi–Gear Tire & Auto Supply, Inc.,* 257 Md. 470, 476, 263 A.2d 507 (1970) (same). Moreover, "[a]side from a statute of bankruptcy or insolvency, a debtor has a right to transfer in good faith and for a fair consideration, even though it consists of an antecedent indebtedness, all or part of his property to one creditor, although he is insolvent and such transfer hinders or delays his creditors." *Kennard, supra,* 176 Md. at 504, 6 A.2d 258. A debt is "antecedent" if it predates the debtor's insolvency. *See Berger, supra,* 257 Md. at 476, 263 A.2d 507 (noting that debts

incurred over the course of several years before a judgment rendering the debtor insolvent was entered were antecedent debts).

In the instant case, there was no evidence presented in the summary judgment record that the attorney's fee Bonnie paid from the tax refunds transferred to her by William was an antecedent debt, *i.e.*, a debt that was incurred before the Bank obtained its judgment against William on November 25, 1998. The record discloses only that the fee was for services rendered in connection with a default judgment entered against William by a court in Massachusetts sometime in 1999, after the judgment in the Debt Action was entered. Bonnie did not present any evidence that could support a finding that the attorney's fee was a debt that predated the judgment, and thus was an antecedent debt. Accordingly, even assuming that William's transfer of the tax refunds to Bonnie and her payment from the refunds of the attorney's fees could constitute fair consideration if the fee debt was antecedent to the judgment,[20] there was no evidence that the fee debt in fact was antecedent to the judgment. Accordingly, the court properly granted summary judgment to the Bank on that claim.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**20.** Even if there were evidence that the fee was an antecedent debt, this would only mean, as the Bank pointed out in the hearing on the cross-motions for summary judgment, that William himself could have used the tax refunds to discharge the debt, which would not have been a fraudulent conveyance. However, William transferred the tax refunds to Bonnie, and then she paid the debt. Bonnie cannot now argue, however implicitly, that fair consideration flowed from the attorney whom she paid, through her, to William. Fair consideration for a conveyance must flow from the *initial* transferee—which in this case was Bonnie—and not merely from the ultimate recipient of the funds. *See* CL § 15–203.